# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 25-cr-0065-01 |
| VERSUS | JUDGE TERRY A. DOUGHTY |
| EAAN LEE BLAKE (01) | MAG. JUDGE KAYLA D. MCCLUSKY |

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress [doc. #31] filed by Defendant Eaan Blake ("Blake"). The motion is opposed. [doc. #35]. For reasons stated below, it is **RECOMMENDED** that the motion be **GRANTED IN PART** and **DENIED IN PART**.

## Background

On February 16, 2025, Chief Robert Spaulding ("Chief Spaulding") of the Portland, Arkansas Police Department spotted a white Chevy Trailblazer which was determined later to be driven by Blake.  [doc. #34, p. 2].  Chief Spaulding's radar indicated that the Trailblazer was traveling approximately 20 miles per hour over the posted speed limit.  *Id*.  Chief Spaulding activated his lights and siren and began a routine traffic stop.  *Id*.  As Chief Spaulding approached the Trailblazer, he noticed that the driver appeared to be wearing some sort of black face covering.  *Id*.  Before Chief Spaulding could make contact, the driver quickly accelerated the Trailblazer and fled the scene.  *Id*.  Chief Spaulding ran back to his patrol vehicle and began pursuit of the Trailblazer on U.S. Highway 165.  *Id*.

Chief Spaulding notified dispatch that he was in a high-speed chase traveling south toward Morehouse Parish, Louisiana.  *Id*.  Dispatch alerted Morehouse Parish Sheriff deputies that the

chase was moving in their direction, and deputies set up a roadblock with tire spikes. *Id*. As Blake approached Mer Rouge, Louisiana, Morehouse Parish Sheriff deputies were able to successfully spike the Defendant's tire. *Id*. Blake attempted to continue fleeing from officers but was eventually unable to continue driving the Trailblazer. *Id*. Blake traveled over forty miles during the twenty-one minutes the high-speed chase took place. *Id*. After the Trailblazer came to a stop, officers from Morehouse Parish, as well as Chief Spaulding, approached Blake's vehicle with their service weapons drawn. *Id*. at 3. Blake was ordered by the officers to open his door from the outside. Blake stated that he was unable to open the car door as it was locked. *Id*. Officers removed Blake through the driver's side window of the car and placed him in handcuffs. *Id*.

Once Blake was handcuffed, Chief Spaulding escorted him back to Chief Spaulding's patrol car. *Id*. Sometime prior to Chief Spaulding escorting Blake, one of the other officers on scene had removed a red backpack from the Trailblazer and placed it on the hood of Chief Spaulding's patrol car. *Id*. While escorting Blake, Chief Spalding asked him, "what did you run for, dude?" to which Blake replied, "the car's full of drugs." *Id*. Chief Spaulding at this point *Mirandized* Blake and placed him in the back of the patrol car. *Id*.

While Chief Spaulding was speaking with Blake, other on scene officers opened the red backpack and discovered Blake's name written inside. *Id*. Chief Spaulding wrote in his report that he "observed an officer from the Mer Rouge Police Department laying large vacuum-sealed bags of a green leafy substance onto the hood of my patrol car." [doc. #31-2, p.2]. This was later determined to be approximately 6.83 pounds of marijuana. [doc. #1-1, p.3]. Chief Spaulding then informed the officers of Blake's statement that the car was "full of drugs." [doc. #31-2, p.2]. Upon further search of the vehicle officers discovered a small black suitcase in the back seat that contained six clear plastic bags of what was later determined to be approximately 14.47 pounds of

methamphetamine. [doc. #1-1, p.3].  At that point, officers requested a search warrant for the vehicle. [doc. #34, p. 2].  Following this discovery, Blake was transported to the Morehouse Parish Sheriff's Office, and his car was impounded.  *Id*.  Investigator Ryan Floyd ("Investigator Floyd") of the Morehouse Parish Sheriff's Department submitted an affidavit to obtain a search warrant to search the Defendant's impounded vehicle.  [doc. #34-1, p. 2].  Based on this affidavit, Fourth Judicial District Court Judge Scott Leehy issued a warrant to search Blake's vehicle.  *Id*. at 4.

Officers, in carrying out the search warrant, found the following: (1) a large black suitcase in the cargo area of the vehicle which contained twenty-four clear bags of suspected methamphetamine weighing approximately 52.45 pounds; (2) a large gray suitcase, with attached tag bearing Blake's name, in the cargo area of the vehicle which contained sixteen clear plastic bags of suspected methamphetamine weighing 56.05 pounds; (3) a camouflage backpack on the backseat of the vehicle which contained two clear plastic bags of marijuana weighing approximately 2.32 pounds and one clear plastic bag of suspected methamphetamine weighing approximately 2.07 pounds; (4) receipts from two hotels in California and Arizona bearing Blake's name; (5) six dosage units of acetaminophen/hydrocodone; (6) a vacuum sealing machine with bags; and (7) $713.00 in cash.  [doc. #1-1].

As a result of the investigation, a federal grand jury returned an indictment against Blake on March 19, 2025, charging him with one count of possession with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii).  [doc. #16].  Blake was arraigned on March 27, 2025, whereupon he entered a plea of not guilty to the lone count. [doc. #24].

On June 13, 2025, Blake filed the instant Motion to Suppress all evidence obtained from— and derived from—the search of his vehicle immediately following the high-speed chase as well

as having the warrant voided for "false representations" made to Judge Leehy to obtain a warrant to search the vehicle.  [doc. 31-1].  Blake contends that the red backpack found by officers was found before the police had probable cause to search the vehicle.  *Id*.  Body-camera footage and testimony of Chief Spaulding showed that the red backpack had been removed from the Trailblazer and that the officers had begun to empty the backpack of its contents prior to Chief Spaulding's return.  *Id*.  Blake argues that this demonstrates officers conducted a search of the vehicle prior to obtaining probable cause for any such search.  *Id*.

Further, Blake argues that any use of his statement "the car is full of drugs" in obtaining probable cause was a violation of his *Miranda* rights.  *Id*.  Blake contends that this statement was given in response to a custodial interrogation that was begun before he was properly read his *Miranda* rights.  *Id*.  Without this incriminating statement, Blake argues there would have been no probable cause to search the vehicle.  *Id*.  As such, the officers would not have discovered the red backpack or suitcase containing illicit substances.  *Id*.  Blake contends that any reliance on this evidence in obtaining the subsequent search warrant was, therefore, improper.  *Id*.

Blake also claims that the affidavit written by Investigator Floyd made "material misrepresentations" to the Court to obtain the search warrant.  *Id*.  Specifically, Blake points to language from the affidavit which claims: "Eaan was taken into custody placed in handcuffs and read his *Miranda* rights. Eaan stated in an excited utterance to officers that the car was filled with dope."  *Id*. at 9.  Blake noted several issues with the affidavit, including that Investigator Floyd:

> (a) omitted that the officers illegally searched the car by removing the red backpack without probable cause before Blake even made the "excited utterance"; (b) omitted that the officers had already opened and were searching the red backpack prior to learning from Chief Spaulding about the "excited utterance"; (c) misrepresented the sequence on the search warrant affidavit to make it appear that the "excited utterance" was made after the Miranda warning when the video and Floyd's own other reports show the opposite; (d) misrepresented the sequence to make it appear that they only searched the car after the excited utterance but in reality they had

searched the car, removed bags from the car, and opened the bag before learning of the excited utterance.

*Id*. at pp. 10-11.  Blake contends that these omissions and misrepresentations were clear *Franks* violations, and, therefore, the search warrant used to justify a subsequent search of the vehicle was also invalid.  *Id.*

On July 11, 2025, the Government filed its response to the motion, arguing that Chief Spaulding had probable cause to arrest Blake for the commission of a felony which, in this case, was the high-speed chase. [doc. #34].  As Chief Spaulding had probable cause to arrest Blake, the subsequent protective pat-down of the passenger compartment of the vehicle was lawful.  *Id.*  The Government further argued that the discovery of marijuana in the backpack as a result of the protective sweep provided probable cause to search Blake's vehicle.  *Id.*  The Government maintains that this exception to the Fourth Amendment did not expire when the vehicle was towed and impounded by the Morehouse Sheriff's Department.  *Id.*

As for the statement made by Blake prior to receiving his *Miranda* warnings, the Government contends that this falls into a valid "public safety" exception.  *Id.*  The Government argues that Chief Spaulding's question of "Why did you run?" was made in order to determine if he and the other officers involved in the stop were safe and necessitated an answer from Blake to ensure that safety.  *Id.*  In the alternative, the Government argues that any *Miranda* violation should lead only to the exclusion of the statement and none of the evidence that was obtained as a result of that statement.  *Id.*

The Government asserts that the existence of probable cause negates the need to examine the validity of the search warrant.  *Id.*  However, the Government maintains that the warrant was in fact valid and created probable cause to search the vehicle.  *Id.*  Therefore, any evidence collected as a result of the subsequent search is admissible.  *Id.*  If the warrant was invalid,

however, the Government argues in the alternative that the search of Blake's vehicle need not be suppressed based on the good-faith exception. *Id*. The Government contends that the officer's reliance on the warrant in "objectively reasonable good-faith" is sufficient even if the affidavit on which the warrant was granted would have been insufficient to establish probable cause. *Id*.

Finally, the Government states that any evidence that was recovered from a search of Blake's vehicle would not ultimately be suppressible under the inevitable discovery doctrine. *Id*. The Government argues that because Blake's car had been rendered undriveable by the spike strip, the Morehouse Sheriff's Office would have towed the vehicle. *Id*. Per the policy of Morehouse Parish, any towed vehicle would have been inventoried. *Id*. Thus, the Government asserts that the contents of the vehicle would have been discovered during the proper inventory, even if "the police had searched the car by other lawful means." *Id*.

A hearing on the Motion to Suppress was held on August 18, 2025. [doc. #37]. Blake filed his post-hearing memorandum on September 21, 2025, reiterating his arguments that all the searches that officers conducted of his vehicle were founded on unconstitutional grounds. [doc. #41]. Blake adds the assertion that any protective sweep was improper, as the officers "specifically aimed to find drugs in the backpack…first, and only after searching for drugs did [officers] go take a peek under the blanket." *Id*. at pp. 13-14. Blake also asserts that Morehouse Parish's lack of a written policy for conducting inventory searches of impounded vehicles demonstrates that they were not following a standard procedure. *Id*. As such, any evidence discovered while the car was impounded is not admissible under inevitable discovery. *Id*.

The Government's response to Blake's post-hearing brief, filed on October 17, 2025, reaffirmed its argument that officers had probable cause to search the vehicle at each step of the

investigation; however, even if they lacked such probable cause the evidence inevitably would have been discovered when the contents of the car were inventoried.  [doc. #43, p. 2].

Blake did not file a reply. Accordingly, the matter is ripe.

### Relevant Testimony and Documentary Evidence

At the hearing, three witnesses testified: Chief Spauling, Christopher Long of the Mer Rouge Police Department ("Officer Long"), and Investigator Floyd.  All three were called by the Government. Additionally, the Government introduced three exhibits, all of which were accepted into evidence.  Blake introduced two more exhibits which were also accepted into evidence.  The Government's first exhibit was the search warrant for Blake's vehicle as well as the application and probable cause statement filed to obtain said search warrant.  (Hearing Transcript [doc. #40, p. 75]) (hereinafter abbreviated as "Tr." followed by the page number).  Its second exhibit was the policy of Morehouse Parish Sheriff's Office policy for the storage of vehicles.  (Tr. 74).  The Government's third exhibit was footage of the events of February 16, 2025, from the body camera worn by Chief Spaulding.  (Tr. 7).  Blake also filed two exhibits into evidence: the supplemental report authored by Officer Long (Tr. 65) and the report authored by Investigator Floyd.  (Tr. 82).

The Court summarizes the relevant testimony and evidence as follows:

Prior to any witness testimony, the Government moved for the admittance of Exhibits One, Two, and Three.  These were admitted without objection.

Chief Spaulding is the Chief of Police of the Portland Police Department where he has been employed as the only police officer for the last four years.  (Tr. 6).  Prior to that, he worked for the Arkansas Highway Police as a commercial motor vehicle inspector and the Ashley County Sheriff's Department as a patrol deputy.  (Tr. 6).  Chief Spaulding has a total of ten years of law enforcement experience.  (Tr. 6).

On February 16, 2025, Chief Spaulding was parked in his stationary vehicle observing traffic when he noticed a white Chevy Trailblazer traveling southbound on U.S. highway 165. (Tr. 6). This vehicle appeared to Chief Spaulding to be going above the posted speed limit. (Tr. 7). Chief Spaulding confirmed that the Trailblazer was traveling fifty-five miles per hour in a posted thirty-five miles per hour zone. (Tr. 7). Chief Spaulding activated his emergency lights and sirens, and the vehicle came to a stop just south of Portland. (Tr. 7). Chief Spaulding exited his patrol vehicle and approached the driver side of the Trailblazer. (Tr. 7). As Chief Spauling reached the rear driver side door, the Trailblazer began to flee southbound. (Tr. 7). Chief Spaulding was wearing his body camera, which recorded the encounter. (Government Exhibit Three).

During the pursuit, Chief Spaulding testified that the Trailblazer was driving erratically with speeds exceeding 100 miles per hour. (Tr. 8). Chief Spaulding further testified that the evasion of an officer in a motor vehicle is a felony offense in Arkansas. (Tr. 8). Just north of Mer Rouge, Louisiana, additional officers joined Chief Spaulding. (Tr. 9). Chief Spaulding testified that officers were successfully able to puncture his tires with spike strips. (Tr. 9). After his tires were punctured, Blake continued for an additional three to four miles. (Tr. 9).

After Blake's vehicle came to a stop, Chief Spaulding testified that he approached the vehicle with his service weapon drawn. (Tr. 10). A Mer Rouge officer and deputy from the Sheriff's Office handcuffed Blake through the window, and, after being unable to open the driver's side door, the officers removed Blake through the driver's side window. (Tr. 10). Chief Spaulding testified that he could not hear the conversation which took place between officers at the window and Blake. (Tr. 13). Once Blake was removed from his vehicle, Chief Spaulding escorted him back to the patrol vehicle. (Tr. 13). It was during this time that Blake made the statement that "[t]he car is full of drugs." (Tr. 13). Chief Spaulding then read him his Miranda rights. (Tr. 13).

Chief Spaulding testified that the red backpack was within arm's reach of Blake and that there was no way to see what was in the vehicle due to a large blanket covering the backseat, which created a potential threat to officer safety. (Tr. 16). Chief Spaulding did not transport Blake to the jail, (Tr. 16-17), but did travel to the Morehouse Parish Sheriff's Office to wait on the search warrant. (Tr. 18). Once the search warrant was signed, Chief Spaulding observed the officers search Blake's vehicle. (Tr.18).

The Government then called Officer Long to the stand. (Tr. 41). Officer Long is employed by the Mer Rouge Police Department and has been since 2017. (Tr. 41). Prior to that, Officer Long was employed by the Fourth Judicial District Court as a probation officer. (Tr. 42). Before that, Officer Long was employed at the Morehouse Parish Sheriff's Office. (Tr. 42).

Officer Long received a call about a pursuit coming from Arkansas and began heading north to intercept the scene. (Tr. 43). He confirmed in his testimony Chief Spaulding's account that the officers attempted one spike strip north of Mer Rouge that was unsuccessful before successfully spiking Blake's vehicle one-half mile later. (Tr. 43). Officer Long testified that Chief Spaulding provided cover while he and another deputy approached Blake and placed him in cuffs. (Tr. 44). Officer Long testified that Blake made several apologetic statements before making an unsolicited remark that there were drugs in the vehicle. (Tr. 45). Officer Long also testified that this statement was made prior to Blake being removed from the vehicle and was separate from the statements made to Chief Spaulding. (Tr. 45).

Officer Long stated that he saw several fast-food containers and other various food remnants which, in his experience, could indicate that someone is involved with drug trafficking. (Tr. 46). He also noticed that there was a blanket covering something about five feet in length taking up a majority of the backseat. (Tr. 46). He testified that the blanket and his inability to tell

what was concealed beneath it made him nervous, particularly following a chase such as this one. (Tr. 47). Officer Long could not recall if he or another officer brought the red backpack out of the vehicle but testified it must have been in the passenger cabin as the hatch had not yet been opened. (Tr. 49-50).

On cross-examination, Officer Long testified that he opened a square travel bag which contained what appeared to be vacuum-sealed suspected methamphetamine and marijuana. (Tr. 55). At some point following this, the hatch was opened to reveal additional pieces of luggage which were also opened. (Tr. 55). Officer Long confirmed that he did not know who had taken the red backpack out of the car and had not reviewed Investigator Floyd's search warrant. (Tr. 57). Officer Long then shared that he had created a supplemental report around February 16, 2025, through the Mer Rouge Police Department. (Tr. 58). The report was admitted as the Fourth Exhibit and the first offered by the defense. (Tr. 65). The report stated only that Blake made a statement while being escorted to the patrol vehicle. (Tr. 62). The report also stated that the suitcases found in both the backseat and the cargo area were searched prior to the search warrant being obtained. (Tr. 64).

The Government called the third and final witness, Investigator Floyd. (Tr. 70). Investigator Floyd is employed with the Morehouse Parish Sheriff's Office with the street crimes team. (Tr. 70). Floyd has been an investigator since 2017 and focuses on proactive patrolling in high crime areas. (Tr. 70). Investigator Floyd was not involved in the chase; instead, he was called to the scene as the on-call investigator following the discovery of a large amount of narcotics. (Tr. 71). Investigator Floyd drafted the affidavit of probable cause for a search warrant based on the testimony of on-scene officers, including Chief Spaulding and Officer Long. (Tr. 72). Investigator

Floyd testified that both officers told him that Blake had made a statement along the lines of "there are drugs in the car." (Tr. 72).

Investigator Floyd also testified that Blake's vehicle was taken to the Morehouse Parish Sheriff's Office Operation Center following the acquisition of the search warrant. (Tr. 73). He further testified that it is policy for immobilized vehicles to be towed to avoid obstructions on the highway. (Tr. 73). Once a vehicle is towed by the Sheriff's Office, they follow the state policy in inventorying the contents of the vehicle. (Tr. 74). The policy requires the inventory of everything inside the vehicle, which includes opening any bags in the vehicle to ensure nothing is stolen. (Tr. 75).

On cross-examination, Investigator Floyd clarified that the written policy admitted as Exhibit Two is the Louisiana State policy and not the Morehouse Parish Sheriff's Office policy as they do not have an separate, internal written policy. (Tr. 76-77). However, the training and experience of Investigator Floyd is to inventory the vehicle, particularly when the vehicle is evidence of the crime. (Tr. 77).

In authoring his affidavit, Investigator Floyd relied on a conversation he had on scene with Officer Long. (Tr. 80). Investigator Floyd also authored an incident report which was then admitted into evidence as Exhibit Five. (Tr. 82). The incident report stated that: "Deputies conducted a felony traffic stop on vehicle and made contact with driver Eaan Blake. He was handcuffed and taken into custody. Eaan stated to deputies an excited utterance his car is filled with dope. Then he was read his *Miranda* Rights."

## Law and Discussion

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend.

IV.[1]  "The question that a federal court must ask when evidence secured by state officials is to be used as evidence against a defendant accused of a federal offense is whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution."  *United States v. Cordero*, 465 F.3d 626, 630 (5th Cir. 2006) (citation omitted).

"The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citations omitted).  Evidence obtained in violation of the Fourth Amendment is generally excluded and "cannot be used in a criminal proceeding against the victim of the illegal search or seizure."  *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)). The purpose of this exclusionary rule is to deter unlawful police conduct.  *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).  By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  In *Miranda v. Arizona*, the Supreme Court held that to safeguard this privilege against self-incrimination, law enforcement officers must advise individuals of their rights prior to a custodial interrogation.  384 U.S. 436, 478-79 (1966).  A violation of these protections can result in the exclusion of statements obtained during the interrogation.  *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).  The purpose of the *Miranda* rule

---

[1] The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment.  *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).

is to protect against the inherent compulsion of custodial questioning. *Dickerson v. United States*, 530 U.S. 428, 435 (2000).

## I.      Pre-Miranda Statements

"In general, 'the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless' the defendant has first been given *Miranda* warnings." *United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In *Miranda*, "the Supreme Court determined that 'the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney.'" *United States v. Wright*, 777 F.3d 769, 773 (5th Cir. 2015) (quoting *Edwards v. Arizona*, 451 U.S. 477, 481-82 (1981)). "The rights established in *Miranda* . . . 'were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected.'" *Wright*, 777 F.3d at 774 (quoting *Davis v. United States*, 512 U.S. 452, 457 (1994) (citation and quotation marks omitted)). "Importantly, these rights, or measures, were 'designed to counteract the "inherently compelling pressures" of custodial interrogation.'" *Wright*, 777 F.3d at 774 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991); *see also Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("In *Miranda*, we . . . recognized that 'the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk' that the privilege against self-incrimination will not be observed.")).

*Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Determining whether a person is "in custody"

requires an objective inquiry that depends on the "totality of circumstances." *Wright,* 777 F.3d at 774. A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the defendant's position would have understood the situation to constitute a restraint on his freedom of movement of the degree that the law associates with formal arrest. *Wright*, 777 F.3d at 774; *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006); *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (en banc).

Importantly, "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*. For example, traffic stops—stops which constitute a Fourth Amendment seizure—do not automatically place a person in custody for purposes of *Miranda*." *Bengivenga*, 845 F.2d at 598. While the two concepts share a common element of restraint on freedom, the critical difference between a "seizure" in the Fourth Amendment sense and "in custody" in the *Miranda* sense, "is that custody arises only if the restraint on freedom is a certain degree—the degree associated with formal arrest." *Id*.

However, *Miranda* safeguards only apply "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980). "Interrogation" refers not only to express questioning but also to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit a response." *Id*. at 300. This definition extends only to those words or actions that "the police should have known were reasonably likely to elicit an incriminating response." *Id*. (emphasis in original).

Blake contends that any testimony given in response to Chief Spaulding's question of "what did you run from me for" was elicited prior to Blake being advised of his *Miranda* rights and is, therefore, inadmissible. Blake argues that a reasonable person would have "understood the

situation to constitute a restraint on freedom of movement" to a degree comparable to a formal arrest and was asked a question which would reasonably elicit an incriminating response. [doc. #31, p.8]. In its opposition, the Government asserts that the statement made to Chief Spaulding falls within the public safety exception to the *Miranda* requirement. [doc. 34]. The undersigned disagrees.

At the moment of Blake's statement to Chief Spaulding, Blake was most certainly in custody for purposes of *Miranda*. Blake had been involved in a high-speed chase, was subsequently handcuffed and removed from the driver window of his vehicle, and was in the midst of being escorted to a patrol vehicle. A reasonable person in Blake's position would be remiss not to consider the totality of these circumstances to be a restraint on his freedom of movement or to be conditions amounting to a formal arrest. Given this, Blake was clearly in custody at the time Chief Spaulding asked why he fled police.

The Government's assertion that this question was in furtherance of public safety is unpersuasive. The questions from cases cited by the Government are all clearly meant to protect from immediate harm. *See United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) (finding no *Miranda* violation where the officer asked if a defendant had needles on their person prior to a pat down). Here, Chief Spaulding did not ask a narrowly tailored question to assess the potential immediate risk to himself and other officers. Instead, Chief Spaulding questioned Blake on his motivations for fleeing the police, which was much more likely to elicit an incriminating statement. Further, Chief Spaulding's question was one which was reasonably likely to elicit an incriminating statement. Therefore, Chief Spaulding's question amounted to a custodial interrogation without the requisite *Miranda* warnings and any statement that Blake made in response to that question must be suppressed.

Accordingly, **IT IS RECOMMENDED** that the Motion to Suppress be **GRANTED** to the extent it seeks to suppress statements made by Blake to Chief Spaulding prior to being read his Miranda rights.  However, this does not complete the Court's analysis.

## II.    Search of the Vehicle

### A.    Initial Search

Blake also moved to suppress the evidence found in the search of his vehicle, claiming that the officers did not have probable cause to search his vehicle without the suppressed incriminating statement.  [doc. #31].  The Government asserts that the search of the red backpack constituted a protective pat-down under *Terry* which extends to the passenger compartment under *Long*.  [doc. #34]; *Terry v Ohio*, 392 U.S. 1, 21-22 (1968); *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983).

Traffic stops are seizures within the meaning of the Fourth Amendment.  *Brendlin v. California*, 551 U.S. 249, 255 (2007).  As traffic stops are considered investigative detentions rather than formal arrests, they are analyzed under the *Terry* framework.  *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).  Under that test, a traffic stop is permissible if (1) the officer's decision to initiate a traffic stop was justified at its inception and (2) the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop in the first place.  *Terry*, 392 U.S. at 20.

To justify the decision to initiate a traffic stop, "'an officer must have an objectively reasonable suspicion'" that some sort of illegal activity, such as a traffic violation, has occurred or is about to occur.  *United States v. Broadway*, 850 F. App'x 271, 272 (5th Cir. 2021) (per curiam) (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)).  An officer has reasonable suspicion if he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop.  *Terry*, 392 U.S. at 21.  Courts

look at the totality of the circumstances to determine whether an officer had a "particularized and objective basis" for suspecting illegal conduct. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Seizures "justified only by a police-observed traffic violation" may not exceed the time reasonably required to "handle the matter for which the stop was made." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

Here, the traffic stop was justified at its inception by at least one traffic violation: Blake driving twenty miles per hour over the posted speed limit. That traffic violation is undisputed. Therefore, the first prong of *Terry* has been satisfied, and Chief Spaulding was authorized to briefly detain Blake's vehicle. However, despite the Government's assertion that the later search of the red backpack found in the passenger compartment was done as part of a valid *Terry* stop, any *Terry* stop came to an end when Blake fled from the police. *See United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004); *United States v. Baker*, 2019 WL 6768914 (W.D. Tex. 2019) (holding a *Terry* traffic stop came to an end when the defendant fled). Further, any *Terry* stop would have ended, if not when the high-speed chase was initiated, then when Blake was placed under arrest. *United States v. McQuagge*, 787 F. Supp. 637, 654 (E.D. Tex. 1991). Once an individual would objectively believe that they are no longer free to leave, courts have held that the brief nature of a *Terry* stop has concluded, and an arrest has taken place. *See United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir. 1988) (finding that to determine whether the police conduct in this case was an arrest or a *Terry* stop an analysis must be made to resolve whether "a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest…" (quoting *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988)); *United States v. Worthington*, 544 F.2d 1275 (5th

Cir. 1977), cert. denied, 434 U.S. 817 (1977) (noting that whether an arrest or a *Terry* stop occurred "depends upon an evaluation of the testimony of those who were present at the time").

As discussed *supra*, a person in Blake's position would not have reasonably believed that they were free to leave. Therefore, any *Terry* stop which may have occurred came to an end once Blake was stopped and removed from his vehicle. Testimony and body camera footage make clear that the red backpack was removed and searched *after* Blake was taken from his vehicle. Further, the contraband was found *after* Blake was placed in the back of Chief Spaulding's patrol vehicle. (Tr. 21). Thus, any argument from the Government that the red backpack and the contraband it contained were searched in the course of a *Terry* stop is unpersuasive.

However, the Government also asserts that the vehicle, and, subsequently, the red backpack, were lawfully searched under the automobile exception and as a search incident to lawful arrest. The automobile exception permits police to search "every part of the vehicle and its contents that may conceal the object of the search" when there is probable cause that the entire car contains contraband, including the trunk and all containers. *United States v. Ross*, 456 U.S. 798, 825 (1982). On the other hand, the search incident to a lawful arrest exception "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Therefore, the exception permits police to search only the passenger area of an automobile incident to a recent occupant's arrest if it is reasonable to believe the vehicle contains evidence of the offense of arrest. *Id*. Here, Blake had fled from Chief Spaulding, crossing state lines and traveling at high rates of speed. At this point, Blake was being arrested for the crime of fleeing from police officers, and nothing in the record suggests that officers had reason to believe any evidence related to that offense would be found in the vehicle. Thus, officers' search of the vehicle could not be justified under the search incident

to arrest exception. However, even if the *Gant* exception does not apply, a search "can still be reasonable if…another exception applies." *United States v. Owen*, 2009 WL 2857959 at *4 (S.D. Miss. Aug. 28, 2009). Therefore, the Court turns to the automobile exception.

"Under the automobile exception, police may stop and search a vehicle without obtaining a warrant if they have probable cause to believe it contains contraband." *United States v. Beene*, 818 F.3d 157, 164 (5th Cir. 2016) (citation omitted). "Probable cause to search an automobile exists where trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quotations and citation omitted). "The [automobile] exception is justified by the mobility of vehicles and occupants' reduced expectations of privacy while traveling on public roads." *Beene*, 818 F.3d at 164 (citation omitted). "In a vehicle stop on a highway, the fact of the automobile's potential mobility supplies the requisite exigency" needed to justify the search. *United States v. Banuelos-Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (quotation and citation omitted).

The automobile exception also extends to containers within the automobile. *California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."); *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) ("When there is probable cause to search for contraband in a car, it is reasonable for police officers . . . to examine packages and containers without a showing of individualized probable cause for each one.").

In addition to Blake's decision to flee what should have been a routine traffic stop, as Officer Long testified, Blake made a statement immediately upon being stopped that the car was

full of drugs.[2]  Unlike the later statement made to Chief Spaulding, this utterance was not made in response to a question, but was rather a spontaneous admission by Blake.  Considering the totality of the circumstances, the officers had probable cause to believe that narcotics or other contraband were concealed in the car.  *United States v. Fiesco*, 21 F.3d 1108 (5th Cir. 1994).  Given the expansive nature of the automobile exception, the officers possessed probable cause to search, not only the passenger compartment, but any area of the vehicle or containers within which could reasonably contain narcotics.  *Acevedo*, 500 U.S. at 580.  Therefore, the Court finds that the officers had probable cause to search the vehicle and the containers within it based on the statement Blake made to Officer Long in conjunction with Blake's flight from Chief Spaulding.

**IT IS RECOMMENDED** that Blake's motion to suppress be **DENIED** as to the evidence discovered by officers in the warrantless vehicle search.

B.     *Search Warrant*

Blake also argues that the warrant obtained by officers was based on an affidavit which contained "material misrepresentations" requiring a *Franks* hearing and suppression of evidence found in connection with the warrant.  [doc. #31-1].  The Government argues that the fruits of the warrant should not be suppressed under the good-faith exception.  [doc. #34].  When ruling on a contested search made pursuant to a warrant, the Court uses an alternative test.  First, this Court must determine "whether the good-faith exception to the exclusionary rule applies"; if it does not, then the Court must ascertain "whether the warrant was supported by probable cause".  *United*

---

[2] While Officer Long's report, which was provided on the day of the suppression hearing, was not entirely clear on the sequence of events from Blake's arrest, Officer Long testified under oath that the statement referenced in his report was made to him prior to Blake being removed from the vehicle.  The Court finds Officer Long to be credible.  Additionally, there was no testimony given at the suppression hearing to contradict Officer Long's version of events.  Therefore, the Cout takes these statements into account in considering the establishment of probable cause.

*States v. Laury*, 985 F.2d 1293, 1311 (5th Cir. 1993).  Evidence obtained during the execution of a search warrant is not excluded if the officer executing it relied on it in good faith.  *United States v. Leon*, 468 U.S. 897, 922 (1984).  The good-faith exception provides that "evidence obtained by officers in objectively reasonable good faith reliance upon a search warrant is admissible, even though the affidavit on which the warrant was based was insufficient to establish probable cause." *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997) (internal brackets and quotation marks omitted). The good-faith exception must be applied unless: (1) the issuing judge was "mislead by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the issuing judge "wholly abandoned his judicial role" in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant was facially invalid.  *Leon*, 468 U.S. at 923.  Blake challenges the affidavit under *Leon*'s subsection (1) described directly above.

An officer is not entitled to invoke the good-faith exception if the judge who issued the warrant acted after being "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  *United States v. Mays*, 466 F.3d 335, 343 (5th Cir. 2006) (internal quotation marks and citation omitted); *see also Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (providing that intentional or reckless statements must be excised from a warrant affidavit, and evidence must be suppressed if the remaining information fails to establish probable cause); *United States v. Tomblin*, 46 F.3d 1369, 1376-77 (5th Cir. 1995) (applying *Franks* to an allegation of an omission).

Investigator Floyd's testimony at the suppression hearing reflected that he relied on statements from officers, including Officer Long and Chief Spaulding, who were on scene when he was drafting his affidavit. Investigator Floyd was not on scene during the actual incident and was only able to rely on these statements when submitting his affidavit of probable cause. Even assuming arguendo that Officer Long or Chief Spaulding gave Investigator Floyd false information in the creation of the affidavit, *Franks* required. The *Franks* standard requires the movant to demonstrate that the affiant misled the magistrate either *intentionally* or with *reckless disregard* for the truth. *See Franks*, 438 U.S. at 170; *United States v. Thomas*, 627 F.3d 146, 159 (5th Cir. 2010) (finding that the defendant was not entitled to a *Franks* hearing when he did not prove that the inaccuracies in the affidavit were intentional). Blake provided no evidence to support the accusation that Investigator Floyd willfully misled Judge Leehy, and there is no reason for the Court to reach such a conclusion.

Although the affidavit would have benefitted from more clarity as to the sequence of events presented by those who were on scene, nothing in the affidavit itself suggests the investigator acted deceptively. Courts have recognized that "[a]ffidavits are normally drafted by nonlawyers in the midst or haste of a criminal investigation." *Garris v. Rowland*, 678 F.2d 1264, 1273 (5th Cir. 1982) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). In this case, Investigator Floyd was playing a game of proverbial telephone with information from a stressful scene following a high-speed chase which uncovered over 100 pounds of illegal substances. For these reasons, Blake has failed to make the necessary showing under *Franks*. Furthermore, Blake has not demonstrated that Investigator Floyd intentionally or with reckless disregard for the truth misled the State Court judge, and the Court will not abandon the *Leon* good-faith exception on this ground. *See United States v. Arispe*, 328 F. App'x 905, 908 (5th Cir. 2009) (denying the

defendant's motion for a *Franks* hearing and motion to suppress because the defendant failed to show that the affiant intentionally or with reckless disregard for the truth omitted information in the affidavit).

**IT IS RECOMMENDED** that the motion to dismiss be **DENIED** as to the suppression of evidence uncovered as a result of the search warrant obtained for Blake's vehicle.

### C.    *Inventory of Impounded Vehicle*

Finally, the Government argues that even if both the probable cause search of the vehicle and the subsequent warrant were invalid, the evidence which was discovered cannot be suppressed under the inevitable discovery doctrine. The Government asserts that Blake's vehicle would have been impounded pursuant to his arrest and, per Morehouse Parish Sheriff's Office policy, would have been inventoried. Blake argues that this policy was not a standardized policy, and the inventory search was merely a disguise for a warrantless evidentiary search. The undersigned disagrees.

"Inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). This exception serves two principal purposes: "'An inventory of an automobile's contents protects the owner's personal property while it is in police custody and reciprocally protects the police against unfounded claims of lost, stolen, or damaged property.'" *United States v. Hahn*, 922 F.2d 243, 246 (5th Cir. 1991) (quoting *United States v. Judge*, 864 F.2d 1144, 1144-45 (5th Cir. 1989), cert. denied, S. Ct. 1946 (1990)).

Nevertheless, an inventory search cannot be "'a ruse for a general rummaging in order to discover incriminating evidence.'" *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). To prevent inventory searches from concealing such unguided rummaging, the Supreme Court has dictated

that "'[a] single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.'" *Illinois v. Lafayette*, 462 U.S. 640, 648 (1983) (quoting *New York v. Belton*, 453 U.S. 454, 458 (1981)); *see also Dunaway v. New York*, 442 U.S. 200, 213-214. Accordingly, the Supreme Court's "decisions have always adhered to the requirement that inventories be conducted according to standardized criteria." *Bertine*, 479 U.S. at 371 n. 6.

Investigator Floyd testified that, while Morehouse Parish Sheriff's Office does not have its own written policy, they follow the state's policy. Investigator Floyd testified that this was the procedure he was taught in the academy and the policy followed for all vehicles which must be impounded as evidence. Investigator Floyd testified that Blake's vehicle was required to be seized as evidence for involvement in his crime of fleeing the police. Under the policy, the seized vehicle must be "transported to a secured lot under the dominion and control of the Department." The policy further requires an inventory of all vehicles requiring storage.

The Court finds the officers adhered to these standardized procedures and that they conducted the search pursuant thereto, in good faith, and for a caretaking purpose. The inventory was prompted by a legal arrest and carried out in accordance with an established police department inventory policy. It is not required that this policy be written. *United States v. Walker*, 931 F.2d 1066, 1069 (1991); *see also United States v. Frank*, 864 F.2d 992, 1002-03 (3d Cir. 1988), cert. denied, 490 U.S. 1095 (1989); *United States v. Feldman*, 788 F.2d 544, 551-53 (9th Cir. 1986), cert. denied, 479 U.S. 1067 (1987). Testimony regarding reliance on standardized procedures has been deemed sufficient. *See United States v. Como*, 53 F.3d 87, 92 (5th Cir. 1995), cert, denied. 516 U.S. 1049 (1996), citing *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir. 1991), cert, denied, 503 U.S. 949 (1992). Moreover, the policy required that the scope of the inventory be

limited to only that which is "consistent with the objective of collecting, documenting and safeguarding the defendant's property." Limitations of even minute constraint are sufficient to be constitutionally adequate. *See United States v. McKinnon*, 681 F.3d 203,210 (5th Cir. 2012) (holding that an inventory policy which permitted the opening of all containers in the vehicle that were not secured by a lock was constitutionally adequate). The undersigned does not find that the State policy is constitutionally inadequate or that the officers did not carry out the policy in good faith. The contents of the vehicle would have been properly inventoried pursuant to a standardized police policy. Therefore, regardless of the search on scene following Blake's arrest or pursuant to the warrant for the vehicle's search, the large amount of narcotics in Blake's vehicle would have been found by officers in the course of inventorying the vehicle pursuant to their policy.

**IT IS RECOMMENDED** that the Motion to Suppress be **DENIED** insofar as it seeks the suppression of the evidence that would have been found by officers in the course of inventorying the vehicle's contents.

## Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the Motion to Suppress [doc. #28] filed by Defendant Blake be **GRANTED IN PART** and **DENIED IN PART**. To the extent that Blake moves to suppress statements by him while being escorted to the police car by Chief Spaulding and made prior to him being read his *Miranda* rights, **IT IS RECOMMENDED** that the motion be **GRANTED**, and these statements be suppressed.[3] **IT IS OTHERWISE RECOMMENDED** that the motion be **DENIED**.

---

[3] Blake's prior statement, before his removal from the vehicle, should not be suppressed.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CRIM. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under FED. R. CRIM. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections.  Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSEDFACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 20th day of November, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE